IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FRIENDS OF LYDIA ANN CHANNEL, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No.:_____ |
| | § | |
| v. | § | |
| | § | |
| LYDIA ANN CHANNEL MOORINGS, LLC, and | § | |
| | § | |
| UNITED STATES ARMY CORPS OF ENGINEERS, | § | |
| | § | |
| *Defendants.* | § | |

**************************************************************************

<u>COMPLAINT</u>

## INTRODUCTION AND SUMMARY OF THE CASE

1.      Plaintiff Friends of Lydia Ann Channel ("FLAC"), an organization dedicated to the protection of the environmental, cultural, recreational, and aesthetic values of the Lydia Ann Channel and whose members live in, recreate in, and enjoy this unique coastal environment, file this Complaint seeking redress for the ongoing destruction of the environmental, wildlife, recreational and cultural resources located in and near the Channel caused by Defendants Lydia Ann Channel Moorings, L.L.C., d/b/a LAC Fleet ("LACM") and the United States Army Corps of Engineers ("USACE").

2.      The Lydia Ann Channel is a critical component of several of the last pristine ecosystems on the Texas Coast, is home to a diverse array of wildlife, provides spawning grounds for many species, and has cultural and recreational significance for FLAC members and the people of Texas.  LACM's construction and ongoing operation of an unpermitted commercial barge fleeting facility (the "Facility") in or directly adjacent to one of the State of Texas's most important ecological, navigational, and recreational habitats has destroyed the environmental, cultural, and recreational characteristics of the Channel.  Despite having its initial authorization to operate from USACE revoked, LACM continues to operate inconsistently with its original permit and absent legal authority.

3.      The public, FLAC, and its members were misled by a January 31, 2017 Public Notice[1] issued by USACE subsequent to its revocation of LACM's initial Letter of Permission ("LOP") that clearly anticipated the imminent removal of the Facility. The Notice's inclusion of alternative sites and the option of maintaining the Facility were neither expected nor appropriate under the National Environmental Policy Act ("NEPA") and did not include sufficient

---

[1] The January 2017 Public Notice is attached as Exhibit A.

1

information for meaningful agency and public consideration and comment, the most significant aspect of the NEPA process. LACM's actions constitute a public nuisance.

4.      FLAC seeks an injunction to prevent LACM from utilizing the unauthorized facilities and conducting unauthorized activities and that directs the removal of the unpermitted Facility as per the USACE revocation of LACM's original LOP. FLAC further seeks an injunction preventing the USACE from issuing an Environmental Assessment and associated permit based on its deficient January 31, 2017 Public Notice until such a time that a complete and accurate public notice is released, commented upon, and a public hearing is held.

5.      Throughout the various administrative processes connected with LACM's Facility, USACE has continually abdicated its duties under its own regulations and NEPA. USACE originally permitted, then suspended, and eventually revoked a LOP for LACM's Facility, demanding that the Facility be removed and the environment restored. The Corps determined that the original LOP had been obtained based on misleading and/or incorrect information submitted by LACM. Despite this, USACE has allowed the continued operation of the unauthorized Facility for more than two years as it reviews removal plans that improperly contain a retention alternative. USACE has failed to comply with its own regulations, which has allowed for the continued operation of LACM and the associated destruction of the important environmental and recreational resources in which it sits and constitutes a cognizable injury under NEPA and the Administrative Procedure Act ("APA").

## JURISDICTION AND VENUE

6.      This Court has jurisdiction and the authority to grant the relief requested pursuant to 28 U.S.C. § 1331, as this action arises under the APA, 5 U.S.C. §§ 701-706, and NEPA, 42

U.S.C. § 4321 *et seq*.  In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1346 and 28 U.S.C. § 1367.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (e) because the claim arose and the alleged violations have occurred and continue to occur in this District.

## PARTIES

8.      Plaintiff FLAC is a domestic non-profit corporation organized and existing under the laws of the State of Texas, with its principal office in Port Aransas, Texas.  Plaintiff and its members are dedicated to the conservation and protection of the recreational use and ecological importance of Lydia Ann Channel, the adjacent Lighthouse Lakes estuary, San Jose Island, and related bays, marshes, and other bodies of water near Port Aransas, Texas.  Plaintiff seeks to protect and restore environmental quality in those areas through educational and other activities.  Plaintiff's members live in the immediate area of Port Aransas and, in particular, the Lydia Ann Channel.  Other members have frequently traveled to and will continue to travel to the Port Aransas area and to the Lydia Ann Channel.  Prior to the initial authorization of construction and operations of LACM's industrial barge fleeting Facility, Plaintiff's members derived substantial benefit and enjoyment from the Lydia Ann Channel and its environs in fishing, hunting, boating, swimming, wildlife observation and photography, as well as other similar activities.

9.      Plaintiff's members are injured by the Defendant LACM's violation of state common law and USACE's violation of the APA and NEPA.  Specifically, Plaintiff's members have suffered actual injury to their environmental and recreational interests by and through LACM's unauthorized operations of the enormous barge fleeting Facility, which was hastily constructed in the Lydia Ann Channel, in and adjacent to the areas where Plaintiff's members live and recreate, and which is in default of the GLO lease for lack of a valid USACE permit.

Certain members of FLAC have a direct view of the mooring Facility, including its nighttime lights, from their own homes that previously had unobstructed views of the pristine Channel and San Jose Island and associated wildlife.

10.     Defendant LACM's construction and ongoing operation of the barge Facility have caused and are causing interference with navigation and recreation throughout the Lydia Ann Channel.  The ongoing operation of this barge Facility has caused and is causing ongoing harm, harassment, injury, and habitat destruction of endangered species and other wildlife, and is otherwise adversely affecting the environmental, recreational, historical, and navigational resources used and enjoyed by Plaintiff's members. Plaintiff's members' aesthetic and recreational values have been significantly lessened by the operation of LACM's barge mooring Facility.

11.     Defendant LACM is a domestic limited liability company organized and existing under the laws of the State of Texas.  Defendant LACM has its principal place of business in the State of Texas, and its business address is 5858 South Padre Island Drive, Suite 109, Corpus Christi, Texas 78412.

12.     Defendant USACE is an agency of the United States of America, within the Department of the Army, and has been delegated responsibility for management and operation of various rivers, lakes, and other water resources of the United States of America, and the issuance, modification, and revocation of permits relative to various activities taken or proposed to be taken on waters of the United States and their tributaries. As a federal agency, the USACE must comply with federal law, including NEPA. Its actions are reviewable under the APA. The relevant administrative actions, including the issuance and revocation of the initial LOP for the commercial barge fleeting, storage, and service Facility constructed and operated in the Lydia

Ann Channel was processed and approved by the USACE's Corpus Christi Regulatory Field Office, Galveston District, which is located at 5151 Flynn Parkway, Suite 306 in Corpus Christi, Texas.

## FACTUAL BACKGROUND

A.   **The Lydia Ann Channel Has Significant Ecological, Navigational, and Recreational Importance.**

13.    Situated between the Aransas National Wildlife Refuge and the Padre Island National Seashore, the ecological, navigational, and recreational importance of the Lydia Ann Channel cannot be overstated.  It is a major conduit of tidal waters from the Gulf of Mexico to the Aransas Bay system, including Aransas, Copano, Mission, St. Charles, and Redfish Bay. Any hazardous or toxic materials spilled in the Lydia Ann Channel would therefore be transported by tidal flows directly into these environmentally sensitive and ecologically important areas in the Aransas Bay System.  The Lydia Ann Channel's location within the Redfish Bay State Scientific Area is directly adjacent to the Mission-Aransas National Estuarine Research Reserve.  In June, 2000, Redfish Bay was designated a State Scientific Area by the Texas Parks and Wildlife Commission for the purposes of protecting and studying native sea grasses located there.  According to the Texas Parks and Wildlife Department website the "[Redfish Bay State Scientific Area ("RBSSA")] contains the northernmost extensive stands of seagrass on the Texas coast. This includes 14,000 acres of submerged seagrass beds with all five species of seagrass found in Texas present. The RBSSA is a component of both the Aransas and Corpus Christi ecosystems and has about 50 square miles of prime fishing habitat."[2]   The

---

[2]   *Seagrass Protection: A Summary of Seagrass Management in Texas*, TEXAS PARKS & WILDLIFE, http://tpwd.texas.gov/landwater/water/habitats/seagrass/redfish-bay (last visited Oct. 2, 2018).

location, boundaries, and ecological significance of this area is evident from the Texas Parks and

Wildlife Redfish Bay State Scientific Area map:[3]



14.     The Lydia Ann Channel and San Jose Island have been used by the public for

decades for recreational purposes, including fishing, hunting, swimming, boating, crabbing, and

wildlife photography and observation.

15.     San Jose Island is a privately owned island known for its beach and wildlife

observation and photography. Its website indicates that it is home to both the endangered

whooping crane and the piping plover.

---

[3]     Seagrass    Protection    Regulation,    Texas    Parks    &    Wildlife    (2015),    *available    at*
https://tpwd.texas.gov/publications/pwdpubs/media/pwd_br_v3400_1101a.pdf.

16.     The immediate area in which the Lydia Ann Channel is located is considered one of the best places on earth to fish for tailing red drum.  As reported on a leading sport fishing site: "There are numerous cuts, flats and reefs along both sides of the channel and just about any of the bays' game fish can be targeted along its path."[4]

17.     This area has also been repeatedly hailed by *Texas Parks and Wildlife Magazine* as the best place in Texas to paddle and kayak.  In the words of the magazine: "The Lighthouse Lakes trail, near Port Aransas, was the first official paddling trail, and it offers kayakers a mix of mangrove mazes and open flats, with excellent fishing and birding opportunities and views of the Lydia Ann Lighthouse."[5]  The Lighthouse Lakes Paddling Trail, established in 1999 by Texas Parks and Wildlife, runs through the Redfish Bay State Scientific Area, the Mission-Aransas National Estuarine Research Reserve, and the Lighthouse Lakes.

18.     Redfish Bay State Scientific Area is also a favorite among anglers because it contains fifty square miles of prime fishing habitat including the northernmost extensive seagrass beds on the Texas coast and the famous Lighthouse Lakes estuary.

19.     The Channel is also home or adjacent to the habitat of at least eight endangered species: piping plover (*Charadrius melodus),* rufa red knot (*Calidris canutus rufa*), whooping crane (*Grus Americana*), Atlantic hawksbill sea turtle (*Eretmochelys imbricate*), green sea turtle (*Chelonia mydas*), Kemp's ridley sea turtle (*Lepidochelys kempii*), leatherback sea turtle (*Dermochelys coriacea*), and loggerhead sea turtle (*Caretta caretta*).

20.     At least one significant marine archeological site is located in the Lydia Ann Channel and is one of the few 19th century lighthouses remaining on the Texas Coast.  The

---

[4] *Lydia Ann Channel*, COASTAL BEND FISHING, http://coastalbendfishing.com/fishing-location/lydia-ann-channel (last visited Oct. 2, 2018).
[5] Louie Bond, "Bigger in Texas? Why, yes, everything is! Better in Texas? Of Course!," April 2012, TEXAS PARKS AND WILDLIFE MAGAZINE, https://tpwmagazine.com/archive/2012/apr/ed_1_bestoftexas/index.phtml.

Aransas Pass or Lydia Ann Lighthouse, originally built in 1857, still stands on the bank of the Channel – directly adjacent to the newly-built barge fleeting Facility at issue.

21.     A portion of the Intracoastal Waterway Alternate is routed through and follows the natural contours of the Lydia Ann Channel, both of which serve as a major navigational route for recreational and commercial vessels.

22.     The resources within the Lydia Ann Channel belong to the people of the State of Texas and the United States of America, and are of particular importance to FLAC, whose members fish, swim, hunt, boat, study, and otherwise directly use and enjoy the unique resources now threatened by Defendants' actions.   Further, the Channel and FLAC's members are now directly threatened by the massive amounts of toxic, explosive, and otherwise hazardous chemicals being brought into and stored in the Lydia Ann Channel without a valid permit or lease arrangement.

### B.     The Original and Ongoing Administrative Process is Fatally Flawed

23.     On January 15, 2015, the USACE authorized by LOP (DA Permit SWG-2014-00460) a bare-bones permit application submitted by LACM to build what the company had defined as a temporary mooring facility but in actuality was a large industrial barge fleeting facility[6] extending a mile and half along the Lydia Ann Channel for the storage and servicing of a fleet of up to 240 industrial barges.  The barge fleeting Facility advertises that it is one of the largest such facilities in Texas and that it can accommodate "CDC Barges," "Hot Oil Barges," and "Red Flag Barges."[7]   "Red flag barges" are barges that carry hazardous materials.  "Hot oil barges," as the name suggests, carry heavy petroleum products such as tar or asphalt.   "CDC

---

[6] U.S. Coast Guard regulations define a "barge fleeting facility" as "a commercial area…the purpose of which is for the making up, breaking down, or staging of barge tows."  33 C.F.R. § 101.105.
[7] *Services*, LYDIA ANN CHANNEL FLEET, http://lacfleet.com/services/ (last visited Oct. 2, 2018).

barges" carry "Certain Dangerous Cargo" which is defined in federal regulations to include explosives, poisons, corrosive chemicals, and radioactive materials.  33 C.F.R. §160.202.

24.     On March 23, 2016, the USACE suspended the LOP previously issued to LACM. In the suspension letter, the USACE explained that the Facility was not constructed in compliance with the permitted plans, non-permitted structures were installed, and the scope of the project was beyond what was permitted and therefore constituted a change in purpose and need. *See* USACE Letter, 1, September 20, 2016 (FOIA 3933-3935, Attachment).[8]

25.     Following the suspension of the LOP and the specific acknowledgement that LACM had installed unauthorized structures for its industrial barge fleeting Facility in unauthorized locations, LACM continued to operate its industrial barge fleeting Facility, continued to provide services and provisions to barges and tugboats, and even continued to sell fuel through Aransas Fuel, L.L.C.

26.     In a letter dated April 22, 2016, USACE requested information from LACM that would allow USACE to reevaluate the project during the suspension, including revised application materials; as-built drawings; surveys of seagrass, oyster beds, and threatened and endangered species; a draft Biological Assessment; and a robust alternatives analysis. *See* USACE Letter, 1, September 20, 2016 (FOIA 3933-3935, Attachment)

27.     LACM submitted some materials in response to this letter on June 15, 2016, but USACE found them unsatisfactory.  Importantly, LACM did not submit a sufficient retention or relocation plan in accordance with 33 C.F.R. § 325.7 to allow USACE to consider the retention or relocation of its operations. *Id.*

28.     USACE revoked LACM's LOP on September 12, 2016.

---

[8] The September 20, 2016 Letter is attached as Exhibit B.

29.     In the revocation letter, USACE explained that LACM's "stated purpose and need for the project…does not accurately describe the scope of your operation or address the underlying need for the project from the public interest review perspective." Revocation Letter, 1, September 12, 2016 (FOIA 4122). USACE then unequivocally stated "the dolphins constructed pursuant to the LOP are ***no longer authorized and must be removed.***" *Id.* at 1 (emphasis added).

30.     As part of the revocation and in furtherance of its directive to remove the dolphins, USACE required LACM to submit a removal and restoration plan, including alternatives for the removal process within 30 days of the revocation as well as "the previously requested threatened and endangered species surveys, the surveys of seagrass and oyster beds, and a draft Biological Assessment for Section 7 Consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (NMFS)." *Id.* at 2. Notably, the option to present a revised application or a robust alternatives analysis was not included. Such options are available during the modification or suspension process, per 33 C.F.R. §325.7.

31.     On September 12, 2016, in lieu of submitting the required removal plans, LACM elected to simply re-submit its application for a permit, seeking to have it approved as an after the fact permit as outlined by 33 C.F.R. § 326.3. *See* USACE Letter, 1, September 20, 2016 (FOIA 3933-3935, Attachment).

32.     On September 15, 2016, LACM submitted a supplement to its application, as well as the information requested on April 22, 2016 by USACE which was relevant during the suspension period.

33.     On September 20, 2016, USACE informed LACM that its mooring structures remained unauthorized as nothing had changed since the September 12 revocation. USACE

further stated that LACM's submittal of an individual permit application rather than the requested removal plan was contrary to USACE orders. USACE reiterated that LACM's June 15 submission during the suspension was inadequate to initiate any sort of reevaluation and interagency coordination. USACE explained that there was "***no pending individual permit application***" and that LACM's Facility remained unauthorized. USACE Letter, 1, September 20, 2016 (FOIA 3933-3935, Attachment). Despite this, the letter inexplicably allowed the inclusion of "a detailed alternatives analysis that includes any proposal for retention of some or all of the 62 structures currently in place." *Id.* at 2. This was contrary to 33 C.F.R. § 325.7 and essentially gave LACM the benefits of the procedures available during the suspension period, allowing for submittal of a retention plan or revised application despite LACM's failure to sufficiently do so during the suspension period and despite the fact that LACM's permit was now revoked. A permit that has been revoked cannot be modified.  USACE's letter concluded that it would not consider an additional permit application until the restoration plan was submitted.

34.     On October 12, 2016, LACM submitted its removal and restoration plan. (FOIA 3993-4104).  The removal and restoration portion of the submittal was a mere two paragraphs in length. The bulk of the multipage submission focused on retention and relocation.  In addition to the retention of the structures, LACM's submittal included nine alternatives for relocation, each of which it declared had a fatal flaw by not meeting all of its ten criteria for a suitable site. Such an analysis would have been consistent with the revised permit application and robust alternatives analysis that was requested on April 22, 2016, which LACM failed to timely submit.

35.     On January 31, 2017, USACE published a Public Notice for the submitted "removal and restoration plan." USACE labeled the Public Notice with the same identification

11

number as the previously revoked LOP, SWG-2014-00460, indicating that it was related to the same action and not a new permit. Public Notice, January 2017 (FOIA 4105-4113).

36.     In the notice, USACE reiterated that it had informed LACM that its submission following the suspension was insufficient and submittal of a new permit application was not proper.

37.     USACE's Public Notice also indicated that the information that USACE had required following the revocation of the permit related to LACM's preferred *removal and restoration method*—not for retention of or relocating the Facility. However, throughout the ongoing administrative process, USACE has consistently requested edits to the submitted materials, including a Biological Assessment, to relate them to retention of the Facility, effectively allowing a do-over of the suspension procedures.

38.     USACE indicated in the notice that "[i]f the Corps decides to further consider whether an additional or different location for a barge fleeting facility is in the public interest, a subsequent public notice will be issued." Public Notice, January 2017.

39.     Any subsequently issued notice that could issue would fail to allow for meaningful public comment as the relevant portion of the process, namely the revocation of the LOP and issuance of a removal public notice, have passed. Any public notice detailing the so called alternatives indicate that the Corps has already determined to leave the Facility in place, in effect steamrolling the entire NEPA public comment process.

40.     No such public notice has been issued; nevertheless, USACE now effectively construes LACM's submittal as a new permit application, contrary to its prior position and contrary to applicable regulations. The comment period on the Public Notice ran from January 31, 2017 to March 2, 2017. LACM continues to operate its unauthorized Facility nearly two

years later. USACE continues to deliberate in its administrative process on this "new permit application" disguised as a removal plan under the SWG-2014-00460 record despite no subsequent notice, supplemented information, or new permit identification number.

41.     USACE's lack of transparency and lackadaisical approach to remedying the situation created by the unauthorized structures and its inability or unwillingness to comply with its own regulations and those of NEPA constitute violations of NEPA. These violations have caused and are causing Plaintiff and its members irreparable harm in the form of significant impacts to the riparian and aquatic environment of the Lydia Ann Channel and Redfish Bay State Scientific Area, and degradation of habitat for fish, birds, marine mammals, and other wildlife; and is adversely affecting other critical ecological areas.

### C.     LACM's Ongoing Unauthorized Operations Constitute a Negligently Caused Public Nuisance in the Navigable Waters of Texas

42.     LACM is currently operating an unauthorized Facility in navigable waters of the United States and is simultaneously in violation of its subsurface lease from the Texas General Land Office ("GLO").

43.     It has been established that LACM's Facility as built is not and has never been authorized by USACE.

44.     Any unauthorized structures in navigable waters of the United States are prima facie nuisances under Section 403 of the Rivers and Harbors Act.

45.     As described above, LACM constructed a Facility outside of the parameters set by its application and subsequent LOP. When LACM failed to come into compliance and its LOP was revoked, it was rendered in default of two sections of its lease with GLO, which provide that "[l]esee will comply with, and will cause its officers, employees, agents and invitee to comply with, all applicable federal, State and local laws, ordinances and rules concerning the

13

use of the Leased Premises" and "[l]esee's use of the Leased Premises is subject to and contingent upon compliance with the following covenants, obligations and conditions (the 'Special Conditions'):…Lessee is responsible for maintaining all structures authorized under this lease in good repair and safe condition, and in compliance with all existing state and federal regulations governing such work." SL20140032, §§ 5.02, 5.08, November 1, 2014.

46.     On September 30, 2016, GLO issued a notice of default to LACM following the USACE's revocation of the permit for the mooring dolphins.  Specifically, the letter stated that LACM "is in default due to the mooring dolphin structures located on the Leased Premises, which are no longer authorized under a U.S. Army Corps of Engineers permit and applicable federal regulations and therefore contravene the terms and conditions of the Lease and constitute a material breach of" §§ 5.02 and 5.08 of the Lease. GLO Letter, September 30, 2016.

47.     GLO's letter of default stated that LACM had 30 days to cure the deficiencies and that after 30 days, "the State shall have the right, at its option and sole discretion, to terminate the Lease pursuant to Section 10.01."*Id.*

48.     LACM has not cured such deficiencies and in fact has allowed the Facility to further violate its lease by failing to repair toppled monopoles and broken tripods and retrieve the barges currently grounded some distance onto San Jose Island. Such conditions further violate Section 5.08 of the lease which requires that the premises be kept in good repair and safe condition.

49.     Monopoles are installed between the tripod mooring structures, many of which have toppled over. Water marks and barnacle growth indicate that they have been in this state for quite some time. Further, at least one of the tripod moorings is damaged and missing two of its

arms, which have presumably sunk beneath the surface, possibly causing a subsurface navigation hazard.

50.     The Facility impedes the safer, near-shore route that small craft have historically used as a throughway to avoid the deeper, Intracoastal Waterway Alternative route that runs through the middle of the Channel and is often choppy and used by larger ship and barge traffic. The toppled monopoles and subsurface obstructions present navigation hazards to these small crafts. Further, the remaining monopoles and moorings are poorly marked and are often not adequately visible over the water during certain periods of the tide.

51.     Signs posted around the Facility on top of its mooring structures imply that the public cannot navigate in and around the Facility. LACM had represented that the public would be able to easily navigate between and behind the barges to access the shoreline of San Jose Island as is their right under the Public Trust Doctrine.

52.     The stated purpose of LACM's Facility was to prevent barges from grounding on San Jose Island while waiting to move into the Port. However, residents routinely see barges grounding to the north and south of the Facility accompanied by tug boats with running motors, indicating that the Facility is not and cannot fulfill its stated purpose.

53.     At least six barges are currently or have been abandoned some distance away from the water on San Jose Island, a privately owned island that was cited as the catalyst for the Facility's existence. LACM purported to provide an orderly and safe place to moor barges to protect the sensitive shoreline. However, the use of this precise location for a mooring facility actually facilitated the upheaval and dumping of six barges on known piping plover and whooping crane habitat on San Jose Island. But for the existence of the Facility, these barges would not have ended up on the Island as a result of Hurricane Harvey.

54.     19 out of 20 water samples taken on January 17, 2019 from the area around LACM's Facility indicate oil and grease contamination of varying levels. For example, sample site S-15A, x 2600680.4, y 13145069.53, latitude 27.87856470° N, longitude 97.04347580° W yielded a result of 14.6 mg/L for oil and grease.[9] Naphthalene was detected in one sample location, S-10, x 2600278.97, y 13143071.93, latitude 27.87309060° N, longitude 97.04482130° W. Polycyclic aromatic hydrocarbons ("PAHs") were detected in one location, S-2, x 2599395.48, y 13139994.84, latitude 27.86467050° N, longitude 97.04771390° W, with a spectrum of components that appear to be gasoline combustion products.[10] There was no detection of such chemicals at the background sample sites in the main channel. Such chemical presence constitutes a public nuisance as it contaminates the water, fish and other animals that live there. Contamination in such quantities could not exist but for the presence of a fixed mooring Facility.

55.     LACM has continually disregarded, downplayed, or completely ignored directives from USACE that would provide it with the proper permit or cure its permitting deficiencies.

56.     LACM's disregard for federal law or the requirements of its subsurface lease, as well as its dereliction of duty to maintain safe premises consistent with its lease, the Facility's purpose, and representations it has made to the public and USACE have created a public nuisance, causing damage to the members of FLAC and the general public.

57.     The damage caused by LACM's unauthorized and unpermitted construction and operations is an unreasonable interference with the common rights of the people of the State to the use and enjoyment of the State's cultural and ecological resources amounting to a public

---

[9] A figure marking the sample locations is attached as Exhibit C.
[10] These include Benz(a)anthracene (0.477 ug/l); Benzo(a)pyrene (0.326 ug/l); Benzo(b)fluoranthene (0.539 ug/l); Benzo(g,h,i)perylene (0.401 ug/l); Benzo(k)fluoranthene (0.249 ug/l); Chrysene (0.557 ug/l); Dibenz(a,h)anthracene (0.126 ug/l); Fluoranthene (1.20 ug/l); Indeno(1,2,3-cd)pyrene (0.336 ug/l); Phenanthrene (0.160 ug/l); and Pyrene (0.954 ug/l).

nuisance.  Accordingly, Plaintiff seeks declaratory and injunctive relief against LACM for its ongoing violations of state common law.

### D.   USACE's Ongoing Administrative Process Ignores Regulatory Authority and Constitutes a Violation of NEPA and the APA

#### a.   USACE Has Inconsistently Applied and Misapplied its Regulatory Responsibility

58.   USACE has changed its position on its own authority multiple times since the revocation of the LOP, which emails indicate is only the second time a permit has been revoked by USACE. Its inconsistent application and misapplication of its own regulations has resulted in a NEPA violation that has caused ongoing harm to the members of FLAC and the general public.

59.   USACE has taken contrary positions in judicial proceedings regarding what it is and is not permitted to do under its regulations, and in fact, what its own regulations require.

60.   During a November 15, 2016 judicial proceeding, USACE admitted that its revocation letter instructed LACM to submit the removal plan and that it did not tell LACM to submit a plan for retaining the Facility.  USACE was unable to explain why it nevertheless allowed a retention alternative.

61.   Despite directing LACM that its Facility was now unauthorized and ***"must be removed*,**" USACE represented to the Fifth Circuit that it is *not* authorized to "unilaterally order an erstwhile permitee to remove [a now unpermitted structure.]"[11]

62.   It informed the Fifth Circuit that "[b]ecause significant changes in scope of a permitted activity [are] **processed as new applications for permits**, 33 C.F.R. § 325.7(a), the Corps elected to **process LACM's request as a full permit application**, including a public-interest review and environmental analysis. ROA.1689-90," effectively contradicting everything

---

[11] *Friends of Lydia Ann Channel v. United States Army Corps of Engineers*, 701 Fed.Appx. 352, 359 (5th Cir. 2017) (emphasis added).

it has stated in every communication to LACM, FLAC, and the public.[12] By attempting to re-construe the current administrative process as a change in scope of a permit, USACE misled the Fifth Circuit into believing that the ongoing administrative process was the review of a revised permit application proceeding as a new permit, which is a regulatory impossibility.

63.     While it is true that changes in scope of a permit require a new application, the current administrative process does not support such an outcome. Section 325.7(a) states "Significant increases in scope of a permitted activity will be processed as new applications for permits in accordance with § 325.2 of this part, and not as modifications under this section."[13] This is the first consideration when deciding whether or not to modify and suspend a permit under this section. USACE has yet to issue a public notice that would allow for the consideration of a new permit, but rather has continued the same administrative process under the original revoked permit number and record, SWG-2014-00460.

64.     USACE presented LACM with the opportunity to apply for this new permit in its April 22, 2016 letter requesting all of the relevant documentation, including drawings, studies, and alternatives sufficient to conduct a public interest review. LACM failed to do so, and its permit was revoked. If USACE had truly intended to follow § 325.7 and process the change in scope as a new permit, it would have been unnecessary to follow the suspension and revocation procedures and to request a removal plan.

65.     It is against USACE regulations to allow a company that has consistently failed to comply with USACE direction to submit materials that amount to a new permit application in an effort to comply with an already ended suspension period for a permit that has been revoked. USACE has attempted to circumvent this by allowing for the inclusion of the new application

---

[12] *Id.* (emphasis added).
[13] 33 C.F.R. § 325.7(a).

materials under the same administrative record as the revoked permit, SWG-2014-00460, seeking a change in scope of a permit that no longer exists.

66.     By allowing the company to continue to operate its unauthorized Facility and re-submit materials that are overdue and inadequate, USACE is complacent in and indeed aiding what can only amount to a bureaucratic steam roller. It is apparent that no matter how many times LACM fails to submit information, adequately revise, or follow any direction given by USACE, USACE intends to proceed and grant a permit despite innumerable fatal flaws in the application and administrative process to the detriment of the rights of the members of FLAC.

        **b.**      **USACE Has Ignored and Therefore Violated the Required Regulatory Process**

67.     USACE revoked the LOP pursuant to 33 C.F.R. § 325.7(d). Thus, there cannot now be a revised or modified permit application.

68.     33 C.F.R. § 325.7 regulates the suspension, modification, and revocation of a permit. Upon suspension, the permitee will be "advised that following this suspension a decision will be made to either reinstate, modify, or revoke the permit." 33 C.F.R. § 325.7(c). LACM was given the opportunity to submit a revised application along with the required permit studies and assessments in order to potentially maintain its Facility as is. It failed to do so and the permit was revoked. There is no longer a permit to modify or revise and as such any submission of retention or relocation alternatives must be considered a new permit application. USACE's current position that it is treating LACM's submittal as a new permit application directly contradicts the communications by USACE to LACM and the regulations themselves.

69.     Following revocation, the Facility became an unauthorized structure in the navigable waters of the United States and is subject to enforcement under 33 C.F.R. § 326. Specifically, 33 C.F.R. § 326.3 requires corrective measures.  Following completion of the initial

corrective measures, a violator may apply for an after the fact permit as per 33 C.F.R. § 326.3(e), which requires complying with the regulations set out at 33 C.F.R. § 325, *et seq.* for an individual permit. 33 C.F.R. § 326.3(f) allows for the streamlining of the initial corrective measures and the after the fact permit application but would still require compliance with 33 C.F.R. § 325, *et seq.*

70.     33 C.F.R. § 325.1 delineates the necessary content of an application, which to this day, LACM has never fully complied with, as USACE has confirmed in numerous communications.

71.     33 C.F.R. § 325.2 states that "[w]hen an application for a permit is received the district engineer ***shall immediately assign it a number for identification.*** . . ." (emphasis added) Within 15 days the district engineer is to issue a public notice as defined by § 325.3.

72.     33 C.F.R. § 325.3  states that "[t]he public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the probable impact on the public interest." Or in other words, the public notice is the primary vehicle through which USACE complies with NEPA.[14] "The notice must . . . include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *Id.*

73.     USACE has failed to comply with these regulations.

   **c.     USACE's Public Notice Did Not Contain Sufficient Information for Proper Public Comment as Required by NEPA, As Such Any Environmental Assessment Issued Therefrom is Insufficient**

---

[14] Appendix B to Part 325—NEPA Implementation Procedures for the Regulatory Program, states that the district engineer should complete an environmental assessment "as soon as practicable after all relevant information is available (i.e., after the comment period for the public notice of the permit application has expired)."

74.     Despite the gross misapplication of the regulations and given yet another opportunity for a "do-over," LACM has still failed to provide sufficient information to comply with permitting requirements and has provided nine straw men as alternatives.

75.     Because the Public Notice lacked sufficient information regarding the nine alternative locations and the ten criteria used to judge them, there was no chance for meaningful public comment, particularly meaningful agency comments.

76.     In response to the Public Notice, agencies including United States Fish and Wildlife Service, the National Marine Fisheries Service, the Environmental Protection Agency, the Texas Parks and Wildlife Department, and the Texas Historical Commission all submitted comments indicating that removal of the structures from the bottom of the Channel was the appropriate action and there was still insufficient information to evaluate the proposed "alternative" of leaving the unauthorized structures in place.

77.     Until such a time that the public and commenting agencies are able to provide meaningful comment based on the totality of information submitted to the USACE, an environmental assessment cannot issue and a permit decision cannot be made as per USACE's own permitting and NEPA regulations.

78.     In addition to the lack of sufficient information by which to judge the alternatives, several private commenters and the United States Fish and Wildlife Service noted that "[i]t appears to the Service that an alternative that has a fatal flaw by definition should not be included as an alternative since they are not feasible as described by the applicant based on cost, and/or logistics, and/or technology." United States Fish and Wildlife Service, Comments, 2-3, February 24, 2017.

79.     USACE even observed the lack of sufficient alternatives in a letter to LACM on August 23, 2017. "Based on the Corps review of LACM's alternatives analysis, including LACM's preferred alternative, termed by LACM as 'the No Action alternative,' it seems that none of the alternatives proposed meet LACM's screening criteria and that other reasonable and practicable alternatives may not have been fully explored." USACE Letter, 2, August 23, 2017 (FOIA 3860, Attachment).

80.     No additional alternatives have been provided; rather LACM sent a response to the August 23, 2017 letter on October 30, 2017 indicating that it disagreed that its alternatives analysis was insufficient. The entirety of the letter is dismissive of USACE analysis. Sharon Mattox Letter, October 30, 2017 (FOIA 3965-3985).

81.     Despite this, USACE has continually indicated that it will be releasing an environmental assessment from which a permit decision will issue.

        **d.**      **USACE Has Not Issued a Public Notice for a New Permit but Has Continued the Administrative Process for the Now Revoked SWG-2014-00460**

82.     If USACE was considering the significant change in scope as a new permit application, it was required to issue a new permit application identification number which would be included on the public notice as per 33 C.F.R. § 325.7(a) and 33 C.F.R. § 325.2. Furthermore, a new permit application would not include consideration for removal and restoration.

83.     However, instead of creating a new permit record, USACE treated the removal and restoration plan, which included the retention and relocation alternatives, as part of the original matter, labeling it with the same identification number as the revoked LOP, SWG-2014-00460.  This indicated to the public and FLAC that the notice and the removal and restoration plan contained therein relate back to the LOP. Such a conclusion is reasonable given the

explanations contained in the notice indicating that LACM was told a new permit application was not possible. Further, it would follow that if a removal and restoration plan were required to be submitted for the revoked SWG-2014-00460, a public notice for the related removal work would issue.

84.     USACE indicated in its 2017 SWG-2014-00460 Public Notice that should it choose to consider the alternative locations it would issue a new public notice, not an environmental assessment which constitutes a final agency decision. No such notice has been issued.

85.     Because it has failed to issue a new identification number and accompanying public notice for the new permit required by the change in scope and has instead reissued a public notice for SWG-2014-00460, the ongoing administrative review process relates back to the revocation of the LOP. This revocation constitutes final agency action.

86.     USACE has unlawfully masked a new permit application with the restoration and removal plan within the existing administrative record for SWG-2014-00460. It has permitted LACM yet another opportunity to provide the documentation requested during the suspension for a permit that no longer exists. Because it has chosen to delude the public into thinking the Facility will indeed be removed by invoking the SWG-2014-00460 record, it attached its review of retention and relocation alternatives to a final agency action that is reviewable under the APA.

87.     The inclusion of the removal and restoration plan is a straw man in the entire process.

88.     USACE has all but abandoned consideration of the removal and restoration that was mandated on September 12, 2016.

89.     Upon information and belief, the first mention of the retention or relocation alternatives is found in USACE's September 20 letter, *see* supra ¶ 34, which indicated that "a detailed alternatives analysis that includes any proposal for retention of some or all of the 62 structures currently in place" could be included in the removal and restoration submission. September 20 Letter, at 2. However, this was only an option upon the suspension of the permit, not after the permit was revoked. LACM lost its opportunity to submit such revisions when it failed to comply with the suspension regulations.  And USACE is violating its regulations by treating the untimely retention and relocation plan as a new permit.

90.     Upon information and belief, communications between USACE and LACM since the close of the comment period have focused exclusively on the retention of the original site and the alternative locations, contradicting 33 C.F.R. § 325.7 and in violation of 33 C.F.R. §§ 325.2 and 325.3.

91.     USACE continues to coach the company through the proper way to present its materials.

92.     LACM has failed to even properly define the Facility. In August 2017 USACE instructed LACM to define the project based on a large-scale commercial fleeting Facility, *see* supra ¶ 79, and again in May 2018, USACE once again corrected LACM's flawed work, requesting that it revise "your October 12, 2016 Biological Assessment to define the project as retention of the existing structures and operations of a barge fleeting facility." USACE Letter, May 8, 2018 (FOIA 3416). Importantly, the requested Biological Assessment in September 2016 was meant to be for *removal and restoration* upon revocation.

93.     USACE informed the Southern District of Texas that it intends to release an Environmental Assessment in the near future. Such Environmental Assessment is only required

and can only issue from a permit application as per C.F.R. § 325.2. This assessment could conceivably only be for the retention of the Facility. Such an assessment inherently violates NEPA as there was no opportunity for meaningful comment on either the removal and restoration plan, specifically the included alternatives, or a new permit application for which no public notice was issued.

94.     This is a violation of 33 C.F.R. § 325 permitting procedures, as the only public notice issued was for SWG-2014-00460 and related back to the corrective measures from the revocation of the LOP. Any actions taken pursuant to this notice alone related back to that administrative record and that final agency action. No further public notice has issued. No subsequent information has been provided to supplement the complete lack thereof in the current notice. Any environmental assessment under these circumstances inherently violates NEPA and the APA.

95.     USACE's willingness to work with a company that has consistently failed to comply with USACE direction, coupled with its failure to comply with its own regulations, and its arbitrary and contradictory positions found in the current record, indicate the arbitrary and capricious manner in which USACE has handled and will continue to handle the revocation of SWG-2014-00460 in violation of NEPA and the APA and to the detriment of the members of FLAC.

**CAUSES OF ACTION**
**Count 1: Public Nuisance**
**(Defendant LACM)**

96.     Plaintiff reasserts, re-alleges, and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

97.     The unauthorized dolphins that LACM has constructed in the Lydia Ann Channel, as well as LACM's unauthorized and unpermitted operation of an industrial barge fleeting Facility, fuel sales, and related commercial activities in Lydia Ann Channel, have caused extensive damage to cultural and ecological resources in the area, and have significantly interfered with public recreational activities.  The damage caused by LACM's unauthorized and unpermitted construction and operations is an unreasonable interference with the common rights of the people of the State to the use and enjoyment of the State's cultural and ecological resources, amounting to a public nuisance.

98.     Under Texas law, a public nuisance is a condition that amounts to an unreasonable interference with a right common to the general public.   A public nuisance is maintained (1) by act, or by failure to perform a legal duty, (2) intentionally causing or permitting a condition to exist, and (3) which injures or endangers the public health, safety or welfare. *Lake Travis Independent School Dist. v. Lovelace*, 243 S.W.3d 244 (Tex. App. Austin 2007); *In re Premcor Refining Group, Inc.*, 233 S.W.3d 904 (Tex. App. Beaumont 2007).

99.     LACM has negligently caused and maintained a nuisance in the Lydia Ann Channel by failing to operate pursuant to a federal permit and maintain its premises pursuant to its subsurface lease.

100.     As described herein, LACM constructed dolphins in the Lydia Ann Channel that were never authorized by the USACE.  Pursuant to 33 C.F.R. § 322.5, the USACE is required to regulate structures "and/or work in or affecting navigable waters."  33 C.F.R. § 322.3(a). "Structures" include:

> Without limitation, any pier, boat dock, boat ramp,  wharf,  dolphin,  weir,  boom, breakwater,  bulkhead,  revetment,  riprap, jetty,  artificial  island,  artificial  reef,

> permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction.

*Id.* § 322.2(b).

101.    Defendant LACM's LOP with regard to this Facility was formally revoked by USACE on September 12, 2016 because of its noncompliance with the original application. In addition, the GLO placed LACM in default on the lease that it had issued, which required a permit to operate, along with the LOP.  *See* USACE Public Notice 2017 re: SWG-2014-00460.

102.    LACM's construction of dolphins and other structures, without first obtaining the required authorization, has and will continue to cause impairment and destruction of cultural and ecological resources in the area.

103.    A portion of the federal channel, and the existing unpermitted Facility, is located within the State designated Redfish Bay Scientific Area as established by Texas Natural Resources Code Title 31 Section 57.921.

104.    Further, LACM's unauthorized operations along the Texas Gulf Coast and in the Lydia Ann Channel have displaced and significantly interfere with public recreational activities such as fishing, swimming, hunting, boating, and birding and constitutes an ongoing threat to both navigation and to public health and safety.

105.    For example, LACM's operation of its unpermitted industrial barge fleeting Facility and associated commercial enterprises have harmed or endangered the habitat of at least eight federally-listed endangered or threatened species.  As a direct result of the operation of this commercial, industrial  fleeting Facility, the massive amounts of toxic, explosive, and otherwise hazardous chemicals now being brought into and stored in the Lydia Ann Channel, numerous

tugboats and barges churning the water, scouring the sea floor, increasing turbidity, and destroying seagrass beds, unreasonably harm and harass these resources.

106.    LACM's Facility is not located in an area in which it could protect a shoreline from barges breaking free and landing on a known habitat for endangered whooping cranes and piping plovers.

107.    LACM has also failed to prevent barges from nosing up onto the shoreline of San Jose Island.

108.    The location of the Facility impedes a historically used small craft throughway and the toppled, unmarked monopoles present navigation hazards.

109.    Signs at the Facility intimate that the public may not freely navigate around the Facility and near the shore of San Jose Island.

110.    Defendant LACM's agents have used the Coast Guard to intimidate and harass other boat presence around the Facility.

111.    LACM's operations have contaminated the waters of the Lydia Ann Cannel with oil and grease, naphthalene, and PAHs.

112.    Texas residents, including Plaintiff's members, have sustained damage to their cultural and ecological resources as a result of LACM's unauthorized and unpermitted constructions and operations.

113.    LACM has acted negligently to create this public nuisance by failing to maintain its premises in breach of its duty enumerated in its lease with GLO.

114.    LACM has acted negligently to create this public nuisance by breaching duties created by the Rivers and Harbors Act, specifically it caused to be erected an unpermitted Facility in the navigable waters of the United States that constitutes a prima facie nuisance.

115.    LACM's unauthorized and unpermitted operation of its Facility interferes with the comfortable enjoyment of the environment for the people of the State of Texas, and also interferes with or displaces of recreational activities and causes impairment and destruction of cultural resources.

116.    LACM's interference with the public's common right is unreasonable because it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience.  Further, LACM's interference with the public's rights is unreasonable because LACM's construction and operations are unauthorized and unpermitted in violation of relevant laws and regulations.

117.    LACM's conduct is of a continuing nature and has produced permanent or long lasting effects.

118.    LACM knew or should have known that its conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public to a clean and healthy environment.

119.    LACM's conduct created this public nuisance and LACM's actions were a direct and legal cause of the public nuisance and resulting damage.

120.    But for the existence of LACM's Facility, Plaintiff FLAC would not have suffered damage to its cultural and ecological resources or its use of the public trust.

121.    Plaintiff seeks injunctive relief to abate the public nuisance caused by LACM in the form of an order requiring LACM to (i) cease all unpermitted and unauthorized operations; (ii) remove its unpermitted dolphins and other unpermitted structures; and (iii) restore the area in a timely and expeditious manner.

122.    For the foregoing reasons, Plaintiff and Texas residents shall be irreparably harmed if such an order is not granted.

**Count II: Violations of NEPA**
**(Defendant USACE)**

123.    Plaintiff reasserts, re-alleges, and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

124.    The National Environmental Policy Act, 42 U.S.C. § 4332 requires federal agencies to "identify and develop methods and procedures…which will insure that …environmental amenities and values may be given appropriate consideration in decision making…" 42 U.S.C. § 4332(B).

125.    As a procedural statute, NEPA does not guarantee a particular result but a process. A person is injured by a failure to comply with NEPA procedure and may complain of that failure at the time the failure takes place.

126.    USACE regulations 33 C.F.R. § 325 Appendix B for USACE NEPA procedures require an environmental assessment to be issued following the proper notice and comment period, described at 33 C.F.R. § 325.3.

127.    Proper notice and comment issues from a properly filed and identified permit application with sufficient detail to warrant a public notice that will produce meaningful agency and public comment. 33 C.F.R. § 325.3.

128.    USACE has admitted that significant changes in scope of a permitted project require a new permit application. 33 C.F.R. § 325.7(a).

129.    LACM's project is no longer permitted as its LOP was revoked under 33 C.F.R. § 325.7(d). No public notice for a new permit has been issued.

130.    By requesting a removal and restoration plan, even with the addition of retention and relocation alternatives, USACE has proceeded under and acted in connection with the revocation of SWG-2014-00460 and any action taken therefrom relates back to the final agency action of revoking LACM's LOP.

131.    USACE has not provided sufficient information for public comment, as noted by multiple state and federal agencies, to satisfy the burden of NEPA.

132.    By failing to issue proper public notice, USACE cannot have taken the requisite hard look at environmental considerations.

133.    USACE is presently in violation of NEPA for its failure to issue a new permit identification number associated with the retention and relocation alternatives and an associated public notice with sufficient information to allow for meaningful public comment to comply with the public notice function of the Act.

134.    USACE is further in violation of NEPA by disguising a new permit application as an enforcement procedure involving the removal of the Facility and restoration of the Lydia Ann Channel. 33 C.F.R. §§ 325.2, 325.3, and 325.7.

135.    USACE's present administrative process is reviewable as it relates back to final agency action.

136.    If USACE proceeds under the current flawed administrative process, it will amount to bureaucratic steamrolling.

137.    Plaintiff seeks to enjoin USACE from issuing an environmental assessment in the present administrative action until such a time as the above deficiencies are cured and the public and state and federal agencies are given adequate information to submit meaningful comment as required by NEPA.

### Count III: Violations of the APA
### (Defendant USACE)

138.    Plaintiff reasserts, re-alleges, and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein

139.    The APA provides for judicial review of a final agency action, and it requires the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

140.    USACE has abdicated its duties under its permitting regulations, including those set out at 33 C.F.R. § 325 Appendix B by allowing for the submission of what amounts to a new permit application under a public notice for the removal and restoration plan related to the revocation of SWG-2014-00460.

141.    USACE has acted in an arbitrary and capricious manner not in accordance with law by allowing for the inclusion of a retention and relocation plan with the removal plan associated with the revocation of SWG-2014-00460.

142.    USACE has acted in an arbitrary and capricious manner not in accordance with law by failing to issue a separate identification number and public notice for the retention and relocation plans.

143.    USACE has acted in an arbitrary and capricious manner by indicating to the Southern District of Texas that it will be issuing an environmental assessment in relation to SWG-2014-00460 following an inadequate public notice that did not present opportunity for meaningful public and agency comment.

144.    Plaintiff has and will continue to suffer damages if this administrative process continues in this arbitrary and capricious manner.

145. The actions of USACE described *supra* are arbitrary and capricious and an abuse of discretion, without observance of procedure required by law, and unsupported by substantial evidence.

## REQUESTED RELIEF

WHEREFORE, Plaintiff FLAC prays that the Court grant the following relief:

(a)     Declare that LACM has caused and continues to cause a public nuisance by its ongoing use and operation of an unauthorized and unpermitted industrial barge Facility, conducting other unauthorized and unpermitted commercial activities in the Lydia Ann Channel, and by ignoring adverse impacts to natural, cultural, navigational and recreational resources of the State;

(b)     Enjoin LACM from using any of the unpermitted, unauthorized dolphins, or any other structures in the area for any reason whatsoever;

(c)     Enjoin LACM from conducting any unpermitted or unauthorized activities in Lydia Ann Channel including, but not limited to, fuel sales;

(d)     Declare that LACM must remove all unpermitted and unauthorized structures from Lydia Ann Channel, and must restore the area, and comply with all applicable federal and state laws and regulations while doing so;

(e)     Declare that LACM must plan for and complete removal of all unpermitted structures and the restoration of Lydia Ann Channel in an expeditious and efficient manner, and in compliance with completion deadlines to be determined by this Court;

(f)     Declare that in proceeding in SWG-2014-00460, USACE has improperly continued the previous administrative action;

(g)     Declare that USACE issued an insufficient public notice and in doing so has violated the fundamental purpose of NEPA from which no new permit may issue;

(h)     Declare that USACE's actions are arbitrary and capricious and an abuse of discretion, without observance of procedure required by law, and unwarranted by the facts;

(i)     Enjoin USACE from issuing an environmental assessment and associated permit based on the January 31, 2017 public notice for SWG-2014-00460;

(j)     Award Plaintiff its costs of litigation, including, but not limited to, attorneys' fees, consultants' and expert witnesses' fees, and costs; and

(k)     Award such additional relief as justice may require, together with Plaintiff's fees and costs in this action.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 29th day of May, 2019,

KANNER & WHITELEY, LLC

*/s/Allan Kanner*
Allan Kanner, Esq.
Texas Bar No. 24068570
Cynthia St. Amant
Texas Bar No. 24002176
Elizabeth B. Petersen, Esq.*
Allison S. Brouk*
701 Camp Street
New Orleans, Louisiana 70130
Telephone:     504-524-5777
Facsimile:     504-524-5763
a.kanner@kanner-law.com
c.stamant@kanner-law.com
e.petersen@kanner-law.com
a.brouk@kanner-law.com
*Pro Hac Vice Motions Forthcoming*

**Attorneys for Plaintiff Friends of Lydia Channel**

34