# Exhibit A



# Public Notice

| | | |
|---|---|---|
| **U.S. Army Corps Of Engineers** | Permit Application No: | SWG-2014-00460 |
| | Date Issued: | January 31, 2017 |
| **Galveston District** | Comments Due: | March 2, 2017 |

### U.S. ARMY CORPS OF ENGINEERS, GALVESTON DISTRICT
### AND
### TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

**PURPOSE OF PUBLIC NOTICE:** To inform you of a proposal for work in which you might be interested. It is also to solicit your comments and information to better enable us to make a reasonable decision on factors affecting the public interest. The U.S. Army Corps of Engineers (Corps) is not the entity proposing or performing the proposed work, nor has the Corps taken a position, in favor or against the proposed work.

**AUTHORITY:** This action will be reviewed pursuant to Section 10 of the Rivers and Harbors Act of 1899 and Section 404 of the Clean Water Act.

**PERMITEE:**  Lydia Ann Channel Moorings, LLC
P.O. Box 60267
Corpus Christi, Texas 78466
Telephone 361-992-5223
POC: Mr. Christopher Todd Pietsch

**AGENT:** Sharon M. Mattox, PLLC
1414 Clay
Houston, Texas 77079
Telephone 713-874-9696
POC: Ms. Sharon M. Mattox

**LOCATION:** The site is located in the Lydia Ann Channel, located in State Tracts 294 and 305 on land owned and managed by the State of Texas pursuant to the Submerged Lands Act. The project can be located on the U.S.G.S. quadrangle map entitled: LAMAR, Texas.

LATITUDE & LONGITUDE (NAD 83):
Latitude: 28.132 North;        Longitude: -97.009 West

**BACKGROUND:** The U.S. Army Corps of Engineers, Galveston District (Corps) issued Lydia Ann Channel Mooring, LLC (LAC) a Letter of Permission (LOP) on 15 January 2015 to construct 82 individual mooring dolphins composed of concrete filled 24-inch steel pipe with rubber tires for the purpose of providing temporary mooring for barges and tugs along San Jose Island.  Each mooring dolphin was to be placed 100 feet part in water depths no less than 12 feet of depth.  The project site is located off the east bank of San Jose Island adjacent to Lydia Ann Channel, a component of the Gulf Intracoastal Waterway (GIWW) which is a federally authorized shallow draft navigation project.

Based on LAC's stated purpose and need for the project, the Corps interpreted 33 CFR § 325, Appendix B, paragraph 7(b), to define the scope of analysis for the Corps' public interest review of the proposed action to be limited to the dolphin structures.  In arriving at these conclusions, the Corps considers the impacts to navigation, but does not regulate the activities of vessels which navigate in federal waters unless they constitute an "obstruction" under 33 U.S.C. §§ 403,409 of the Rivers and Harbors Act.  At the time of this evaluation, the Corps had not identified the grounding of barges in this location to constitute an obstruction to navigation; therefore the Corps limited its scope of analysis to the actual physical structures that make up the overall facility.  The Corps did not fully consider the number of and types of barges, their contents, or the manner in which they were being operated as within its scope of analysis because they were not permanent structures subject to the Corps' Section 10 authority.

Soon after construction was complete and operation at the facility started on March 16, 2015, the Corps began to receive complaints that it had failed to conduct a thorough review and that LAC was not adhering to the terms of the LOP.  A number of articles appeared in the local newspaper questioning the Corps' actions.  A lawsuit was filed by Friends of Lydia Ann Channel on 23 December 2015 alleging various violations of NEPA and the Endangered Species Act (ESA).  Furthermore, the complaint alleged the facility was not operating within the parameters identified in the LOP.

A site visit was conducted by the Corps on February 8, 2016 to inspect the site for compliance with the term and conditions of the permit.  During this inspection, the Corps determined that LAC had constructed only 67 of the 82 dolphins and that the project was not in compliance with the permitted plans.  The dolphins constructed were not of the same engineering design as the dolphins authorized in the LOP and their locations are up to 17 meters away from where their authorized to be placed.

Additional structures were also identified during this site visit.  Two spud barge pilings associated with a structure referred to as the 'house barge', a spud barge that had been recently relocated to LAC's topside repair facility located in Rockport, were still in tidal water.  While LAC had no objection to removing the spud barge pilings and did so, their unauthorized placement and use of a spud barge referred to as the "house barge" in a navigable water raised additional concerns about obstructions to navigation not included in the permit application.

As the District continued to investigate; however, substantial questions as to the scope of LAC's operation arose. An investigation of the operation revealed that LAC was not, in fact, operating the facility as a temporary mooring site – but was actually conducting large scale fleeting operations that exceeded the scope of what the Corps had permitted.

Texas Department of Transportation's (TxDOT) *Master Plan for the Gulf Intracoastal Waterway in Texas* dated August 2014 highlights the distinction between mooring and commercial fleeting. Mooring areas are distinguished from fleeting areas by the fact that they are only supposed to be used for a short time in response to unforeseen conditions, such as severe thunderstorms or high winds; they are not intended for use that lasts days. In contrast, TxDOT defines a fleeting area is an area for holding barges in between shipments; barges are cleaned, repaired, or simply stored in these areas for extended periods of time.

While it may be difficult to characterize a fleeting area due to unique ecology and level of development around any particular site, a facility that is designed to provide every service, including groceries and a ride to or from the airport is not analogous to "parking" a barge on the shoreline which LAC proposed they were preventing as a benefit to the coastal environment.

As a result of this change in purpose and need and the determination that the project was not in compliance with the LOP as issued, the Corps initiated the necessary steps prescribed in 33 CFR § 325.7 and suspended SWG-2014-00460 on May 23, 2016 in order to review the stated purpose and scope. The Corps concluded its process, and after thorough consideration of the materials submitted by LAC, the Corps revoked LOP SWG-2014-00460 on September 12, 2016. As a result, the dolphins constructed pursuant to the LOP are no longer authorized. LAC was notified that a removal and restoration plan which included an alternatives analysis of removal methods and identified LAC's preferred removal method was compulsory. The Corps also mandated that the alternatives analysis include seagrass and oyster surveys, threatened and endangered species surveys and a draft Biological Assessment for impacts to listed species that may occur as a result of LAC's preferred removal and restoration method and that this plan was due to the Corps no later than October 12, 2016.

The September 12th revocation letter also notified LAC that continued use of the unpermitted structures may constitute obstructions to navigation and the Corps had referred the matter to the U.S. Coast Guard (USCG) pursuant to 33 C.F.R. § 245.20(a) by letter dated September 12, 2016. To date, no response from the USCG has been received.

LAC submitted a request on September 12, 2016 to publish a public notice of their request to retain the LOP as outlined in their June 15, 2016 submission. The Corps notified LAC on September 20, 2016 that Corps had already notified LAC that their submission did not contain sufficient information to reevaluate the action and initiate coordination with the appropriate resource agencies and that the Corps had granted LAC an extension of time to provide the deficient information until July 27, 2016. LAC did not submit the required

3

PERMIT #SWG-2014-00460

information. The Corps notified LAC in the September 20th letter that the submission of an individual permit application in lieu of the restoration order specified in the revocation notice is incorrect, but that the Corps would allow LAC to submit with their analysis retention or relocation alternatives for consideration.

LAC provided a response, dated October 12, 2016 titled, *"Lydia Ann Channel Moorings, LLC Removal and Restoration Plan & Statement of Alternatives October 12, 2016"*(Report). In the Report, LAC states that removal of the existing mooring dolphins would result in the lack of regulated barge fleeting facility capacity in Corpus Christi Bay or the Lydia Ann Channel. In the short term, a return to temporary barge storage conditions as they were in the months before the construction of the mooring dolphins seems most likely. Thus, the operators would push the barges against the shore of San Jose Island, maintaining the position by continuously operating the engine of the tug or push boat. Therefore, LAC has included an inquiry into the potential alternative locations for barge fleeting in the Corpus Christi area as relevant to the analysis of the public interest in removing the existing mooring dolphins.

**PROPOSED ALTERNATIVES:** The evaluation of alternatives is required under NEPA. A range of reasonable alternatives must be discussed, including the no action alternative, and the effects of those alternatives. To be considered, an alternative must be available, achieve the project purpose (as defined by the Corps) and feasible when considering cost, logistics, and technology. LAC has identified three categories of alternatives including; Removal and Restoration, Relocation, and Retention.

**LAC's Removal and Restoration Alternative:** In response to the Corps' September 12, 2016 revocation and removal order letter, LAC identified three potential methods to remove the dolphins: 1) the dolphins could be pulled from the bay bottom; 2) the dolphins could be cut off at ground level; however, this would leave some structure in place that could be a hazard to future navigation; 3) the structures could be removed using explosive force. This option would be even more disruptive to the environment as well as causing complications with the removal of the resulting debris. LAC has stated that the first method, pulling them from the bay bottom, is their preferred removal and restoration alternative and provides the details below.

The existing 67 mooring dolphins consist of concrete-filled steel casings that extend to a depth of 30 feet below the mud line of the Lydia Ann Channel. Existing infrastructure to be removed includes tripod design mooring dolphins, as well as the single pylon mooring dolphins. There are 33 tripod mooring dolphins each with a footprint of approximately 58 square feet, that would need to be removed resulting in a direct impact area of approximately 1,914 square feet. There are 34 single pylon mooring dolphins, each with a footprint of approximately 9 square feet, that would also need to be removed resulting in a direct impact area of approximately 306 square feet. The combined footprint of all mooring dolphins is 2,200 square feet, or 0.05 acre of substrate.

4

Above-water steel plates and/or platforms on top of the tripod design mooring dolphins would be removed with the use of vibratory, jack-hammer type equipment or hydraulic shears. Above-water steel stabilization bars connecting the support piles to the vertical piles would also be removed with the use of vibratory, jackhammer type equipment or hydraulic shears. The remaining vertical piles and support piles would be removed by cutting at the mud line with hydraulic shears or by a diver utilizing a thermal lance, followed by a crane lifting them out of the water and depositing them into a work barge. Alternatively, the entire mooring dolphins, both above and below the mud line, would be removed from the channel substrate by the crane and deposited into the work barge. Existing concrete that makes up the dolphin interior would also be carefully separated from the steel and removed from the pile dolphin. All demolition material from the mooring dolphin removal would be placed in the work barge and hauled to an appropriate onshore construction and demolition debris landfill. Impact pile-driving is not expected to be part of this Proposed Action. The mooring dolphin removal is expected to take four to five months to complete.

It is expected that the existing 67 mooring dolphins would need to be accessed from the deep water "channel side" as well as the shallow water "shore side" waters. LAC has stated that some direct impacts to the shallow water substrate, submerged aquatic vegetation (SAVs), and oyster beds will be unavoidable. The construction time is estimated to be roughly the same as that required for the construction of the existing facility, or approximately four to five months.

**LAC's Proposed Alternative Sites (Relocation Alternative):** In response to the Corps' September 20, 2016 letter, LAC has identified ten criteria that a location must satisfy to enable a project to meet the needs for barge storage in a manner that is commercially reasonable.  Utilizing these criteria, LAC examined nine alternate locations for a barge fleeting facility in the Corpus Christi, Texas area.  Additional information on alternative locations and the ten criteria are included in Section III of the Report.  The nine locations include:

1. Alternative A - Across from Martin (Exhibit 8)
2. Alternative B - Wood Group Property (Exhibit 9)
3. Alternative C - POCC Property(Exhibit 10)
4. Alternative D - Berry Construction Property (Exhibit 11)
5. Alternative E - POCC Property on the Rincon Channel (Exhibit 12)
6. Alternative F - Conn Brown Harbor (Aransas Pass) (Exhibit 13)
7. Alternative G - GIWW Location West of Rockport (Exhibit 14)
8. Alternative H - GLO water Location #1 (Exhibit 15)
9. Alternative I -  GLO Water Location 2 (Exhibit 16)

If the Corps decides to further consider whether an additional or different location for a barge fleeting facility is in the public interest, a subsequent public notice will be issued.

5

PERMIT #SWG-2014-00460

**LAC's Proposed Retention Alternative (Retention Alternative):** LAC's stated basic purpose of the project as currently constructed and operating is to meet a portion of the existing and reasonably anticipated need to accommodate the temporary mooring of, and preparations for transit of, barges (otherwise known as barge "fleeting") in the area of the POCC and the portions of the GIWW adjacent thereto, in a safe and environmentally responsible manner. LAC has stated that the existing location meets all ten criteria cited above and is considered the preferred alternative for barge fleeting in the Corpus Christi area. Additional information on LAC's Preferred Alternative is included in Section III of the Report. If the Corps decides to further consider whether retention of the existing site for a barge fleeting facility is in the public interest, a subsequent public notice will be issued.

**CURRENT SITE CONDITIONS:** The LAC site is completely contained within the Western Gulf Coastal Plains Ecoregion – Mid-coast Barrier Islands and Coastal Marshes Sub-region. This Subregion extends from Galveston Island in the north to Corpus Christi Bay in the south and is a transitional zone between the humid coastal areas further up the coast and the more arid areas further down the coast.

The Sub-region is underlain primarily by Holocene deposits with saline, brackish and freshwater marshes, barrier islands with washover fans, and tidal flat sands and clays. The most common species in the more saline estuarine marshes include saltmarsh cordgrass (*Spartina alterniflora*), marsh hay cordgrass (*S. patens*) and coastal saltgrass (*Distichlys spicata*). This Sub-region is dominated by barrier islands; salt marshes and wind-tidal flats are generally confined to the back side ("bay side") of the islands. Marsh hay cordgrass becomes less common, whereas black mangrove (*Avicennia germinans*) becomes more common, as one travels south through this Sub-region. Trees are sparse within this Sub-region, except on some of the larger barrier islands.

The Sub-region supports important nursery areas for shrimp, crabs, oysters and a wide variety of game fish. Corpus Christi Bay, found immediately south of the Project Area, marks a boundary between two distinct ecosystems. Copano Bay and Mesquite Bay (to the north) are marked by low to moderate salinity and are utilized by a wide variety of birds, whereas Laguna Madre (to the south) is hypersaline and is dominated by huge expanses of sea grass beds.

A portion of the federal channel, and the existing unpermitted facility, is located within the State designated Redfish Bay Scientific Area as established by Texas Natural Resources Code Title 31 Section 57.921. Based upon visual inspections of the project area, more than half of the area consists of open water. Within the open water areas are non-vegetated deep-water areas, un-vegetated shallows, oyster reefs, and vegetated shallows dominated by two species of sea grasses, including shoal grass (*Halodule wrightii*) and turtle grass (*Thalassia testudinum*). The remainder of the area is dominated by estuarine wetlands, sand beaches, mangroves, and mud flats, characterized by areas of persistent standing water, a lack of rooted macrophytes and a dominance of blue-green algal mats.

6

PERMIT #SWG-2014-00460

**NOTES:** A preliminary review of LAC's proposed alternatives indicates that an Environmental Impact Statement (EIS) is not required. Since environmental assessment is a continuing process, this preliminary determination of EIS requirement will be changed if data or information brought forth in the coordination process is of a significant nature.

This public notice is being issued based on information furnished by LAC. This project information has not been verified by the Corps. As of the date of this Public Notice, the Corps has received but not yet verified the delineation of special aquatic sites.

**OTHER AGENCY AUTHORIZATIONS:** Consistency with the State of Texas Coastal Management Plan is required for all proposed alternatives. LAC has stated that the proposed alternatives comply with Texas' approved Coastal Management Program goals and policies and will be conducted in a manner consistent with said program.

The removal and restoration alternative as well as the relocation alternatives may require Texas Commission on Environmental Quality (TCEQ) certification under Section 401 of the CWA and in accordance with Title 30, Texas Administrative Code Section 279.1-13 to determine if the work would comply with State water quality standards.

The owner of the land affected by this project is the State of Texas and the Texas General Land office makes the primary determination as to the use and disposition of submerged coastal lands in Texas. LAC has secured a lease with Texas for the subject area; however, this lease has been placed in default pending a final determination of this permitting action. While the federal government is not strictly bound by Texas GLO's decision to grant a lease for the use of submerged coastal lands, such a grant is accorded great weight in the USACE's public interest determination. Questions specifically concerning the process and procedure by which Texas grants the use of public submerged lands should be directed to the Texas GLO.

**NATIONAL REGISTER OF HISTORIC PLACES:** The staff archaeologist has reviewed the latest published version of the National Register of Historic Places, lists of properties determined eligible, and other sources of information. The following is current knowledge of the presence or absence of historic properties and the effects of the undertaking upon these properties for two of the proposed alternatives, retention or removal:

Removal and Restoration Alternative: The proposed removal of the barge fleeting facility and restoration of the shoreline, would only cause temporary visual impacts during project activity. Accordingly, the project has no potential to effect the National Register status of the Aransas Pass Light Station (Lydia Ann Lighthouse). In addition, the proposed project will have no direct physical effects to Lydia Ann Lighthouse.

Retention Alternative:  The project area was previously investigated for historic properties and none were found as documented in the report titled "Phase I Marine Cultural Resources Remote-Sensing Survey of a Proposed Mooring Area in Lydia Ann Channel, Aransas County, Texas" prepared by Coastal Environments, Inc. and dated December 2014. There are two known shipwrecks, the John Worthington and the Fire Brick Wreck, in the immediate vicinity. However, both wrecks are well over 50 meters (the standard avoidance distance for ship wrecks) from project activities so no avoidance zones were needed.

Other Alternatives:  The staff archaeologist has not reviewed the nine alternative locations proposed by LAC.

**THREATENED AND ENDANGERED SPECIES:**  Threatened and/or endangered species or their critical habitat may be affected by the work associated with all of the alternatives proposed.  Consultation with the U.S. Fish and Wildlife and the National Marine Fisheries Service will be initiated to assess the effect on threatened and endangered species.

**ESSENTIAL FISH HABITAT:**  This notice initiates the Essential Fish Habitat consultation requirements of the Magnuson-Stevens Fishery Conservation and Management Act.  Our initial determination is that none of the proposed alternatives would have a substantial adverse impact on Essential Fish Habitat or federally managed fisheries in the Gulf of Mexico.  Our final determination relative to project impacts and the need for mitigation measures is subject to review by and coordination with the National Marine Fisheries Service.

**PUBLIC INTEREST REVIEW FACTORS:**  These alternatives will be reviewed in accordance with 33 CFR 320-332, the Regulatory Programs of the Corps of Engineers, and other pertinent laws, regulations and executive orders.  The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity on the public interest.  That decision will reflect the national concern for both protection and utilization of important resources.  The benefits, which reasonably may be expected to accrue from the proposal, must be balanced against its reasonably foreseeable detriments.  All factors, which may be relevant to the proposal, will be considered:  among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs and, in general, the needs and welfare of the people.

**SOLICITATION OF COMMENTS:**  The Corps is soliciting comments from the public, Federal, State, and local agencies and officials, Indian tribes, and other interested parties in order to consider and evaluate the impacts of the proposed alternatives.  Any comments received will be considered by the Corps to determine whether to issue, modify, condition or deny a permit for this proposal.  To make this decision, comments are used to assess impacts on endangered species, historic properties, water quality, general environmental effects, and the other public interest factors listed above.

8

PERMIT #SWG-2014-00460

Comments are used in the preparation of an Environmental Impact Assessment and/or an Environmental Impact Statement pursuant to the National Environmental Policy Act. Comments are also used to determine the need for a public hearing and to determine the overall public interest of the proposed activity.

This public notice is being distributed to all known interested persons in order to assist in developing facts upon which a decision by the Corps may be based. For accuracy and completeness of the record, all data in support of or in opposition to the proposed work should be submitted in writing setting forth sufficient detail to furnish a clear understanding of the reasons for support or opposition.

**PUBLIC HEARING:** The purpose of a public hearing is to solicit additional information to assist in the evaluation of the proposed project. Prior to the close of the comment period, any person may make a written request for a public hearing, setting forth the particular reasons for the request. The District Engineer will determine if the reasons identified for holding a public hearing are sufficient to warrant that a public hearing be held. If a public hearing is warranted, all known interested persons will be notified of the time, date, and location.

**CLOSE OF COMMENT PERIOD:** All comments pertaining to this Public Notice must reach this office on or before **March 2, 2017**. Extensions of the comment period may be granted for valid reasons provided a written request is received by the limiting date. **If no comments are received by that date, it will be considered that there are no objections**. Comments and requests for additional information should reference our file number, **SWG-2014-00460**, and should be submitted to:

    Regulatory Division, CESWG-RD-P
    U.S. Army Corps of Engineers
    P.O. Box 1229
    Galveston, Texas  77553-1229
    409-766-3869 Phone
    409-766-6301 Fax
    swg_public_notice@usace.army.mil


                DISTRICT ENGINEER
                GALVESTON DISTRICT
                CORPS OF ENGINEERS